UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DWIGHT MORROW HENLEY,

        Plaintiff,

v.

C. MILLER, *et al.*,

        Defendants.
_____/

Case No. 1:11-cv-538

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on a motion for summary judgment filed by defendants Robin Gilbert, Blaine Lafler, Colleen Byrnes and Cheryl Miller (docket no. 19).

**I.    Background**

On May 23, 2011, plaintiff filed a complaint in which he alleged that eight state employees violated his civil rights. *See* docket no. 1. After reviewing the complaint on initial screening, the court dismissed all defendants except for defendants Carson City Correctional Facility (DRF) Resident Unit Manager (RUM) Cheryl Miller, DRF Transfer Coordinator Colleen Byrnes, DRF Warden Blaine Lafler and MDOC Central Facilities Manager (CFM) Robin Gilbert. *See* Order (docket no. 6). The court summarized plaintiff's First Amendment retaliation claim against these defendants as follows:

> In January of 2011, Plaintiff was housed at DRF where he held a prison job that paid $3.34 per day, he was placed in a two-man cell, he received weekly visits from his mother, and he resided "close" to his attorney. (Compl. at ¶ 22, docket #1, Page ID#4.)

On January 13, 2011, Plaintiff told his unit manager, Defendant Miller, that she and other MDOC staff were violating MDOC policies related to "control of MRSA and prisoner orientation." (Compl. at ¶ 23, Page ID#4.) In response, Miller asked Plaintiff to prepare a list of the violations. Plaintiff prepared the list and presented it to Miller the following day. Plaintiff also sent the list to Warden Lafler and Administrative Assistant Schafer.

In the list, Plaintiff asserted that: (1) prison staff do not orient prisoners within seven days upon arrival, as required by MDOC Policy Directive 04.01.140(B); (2) prisoners at DRF do not receive classification via a committee as required by Policy Directive 05.01.100(E); (3) staff do not re-coat or reissue pillows or mattresses with chaffed "staph-chek" coating, in violation of "Policy Direction 03.04.100 BCHS (Attachment 7)"; (4) DRF charges the prison benefit fund for the use of a postage meter, in violation of Policy Directive 04.02.110; (5) Level II prisoners who eat dinner first are served breakfast last the following morning, meaning they must wait longer than fourteen hours between meals, in violation of Policy Directive 04.07.100(H); (6) the DRF chaplain improperly interrogates Jewish prisoners who seek acceptance into the Kosher food line, which is a form of "paternalism" and discrimination based on religion; (7) Plaintiff's unit is "always running short of cleaning supplies" and was at that time out of "soft scrub," requiring staff to "dilute the sanitizer beyond recommended use" and thereby increasing the risk of dissemination of disease; (8) prisoners are not always afforded twenty minutes to eat their meals, in violation of ACA regulations incorporated by Policy Directive 03.03.130(B); (9) DRF does not provide replacement fans when prisoners' fans break, in violation of Policy Directive 04.07.100; and (10) prisoners sleeping on a top bunk are given unsturdy, plastic chairs to access the top bunk, in violation of Policy Directive 03.03.130(K). (Compl., Ex. 4, Page ID#21.)

When Plaintiff gave Miller the list, she told Plaintiff that if he pursued grievances about the alleged policy violations, "he would find himself at a less desirable prison." (Compl. at ¶ 28, Page ID#5.) Plaintiff responded that transferring him for writing grievances would violate his constitutional rights. Miller told Plaintiff that "courts never side with prisoners." (Id. at ¶ 30.) Prisoner DeLoach overheard Miller's statements.

From January 17 to January 23, 2011, Plaintiff wrote a series of prison grievances, including one regarding Miller's allegedly threatening statements, and five others regarding specific violations of MDOC policy described in the list presented to Miller. Defendants Niemiec and Duncan rejected the five policy-related grievances as "non-grievable." (Compl., Exs. 6-10, Page ID##25-29.)

On January 25, 2011, Plaintiff was transferred to LCF [Lakeland Correctional Facility]. Transfer Coordinator Bynes and Warden Lafler signed the transfer order and CFA Gilbert approved it. (Compl., Ex. 11, Page ID#30.)

2

> On or around January 28, 2011, Plaintiff filed a grievance alleging that Miller retaliated against Plaintiff by having him transferred to another facility. (Compl., Ex. 2, Page ID#13.) Defendant Niemiec rejected the grievance as duplicative. (Id.)
>
> On February 1, Miller told prisoner Stanley Williams that Plaintiff was transferred to LCF for writing grievances.
>
> On February 2, the Grievance Coordinator at LCF notified Plaintiff that he was being placed on modified grievance access for a period of ninety days commencing on January 28, 2011.
>
> On February 3, Plaintiff mailed the list of policy violations to MDOC Director McKeon.
>
> Plaintiff asserts that he received perfect work reports prior to his transfer, that he has had only one misconduct in ten years, and that many prisoners who remain ticket free and maintain excellent work reports are allowed to remain at DRF for many years. Plaintiff alleges that the transfer has had several negative effects. First, he has been moved from a two-person cell at DRF to an eight-man cube at LCF. He contends that cube settings are noisy and that he struggles to concentrate, engage in educational activities, and obtain more than six hours of sleep per night. In addition, Plaintiff lost a high-paying prison job and it will take him some time to find another job with an equivalent salary. He alleges that his loss of wages hinders his ability to "continue his college education, pay an attorney, purchase food and clothing, call family/friends, and/or more." (Compl. ¶ 54.) Finally, Plaintiff alleges that he is now incarcerated farther away from his mother, who must travel an additional twenty-five minutes to visit him. . . .
>
> With respect to Defendants Miller, Bynes, Gilbert and Lafler, Plaintiff's allegations suffice to state a retaliation claim. Miller threatened that Plaintiff would be transferred for pursuing grievances regarding prison policy violations. Shortly after Plaintiff pursued such grievances, Defendants Bynes, Gilbert and Lafler approved a transfer order, and then Miller reported that Plaintiff was transferred for filing grievances. As a result of the transfer, Plaintiff suffered several negative consequences, including the loss of a high-paying prison job that he needs to pay for an attorney. At this stage of the proceedings, the Court concludes that Plaintiff's allegations against Defendants Miller, Bynes, Gilbert and Lafler are sufficient to warrant service of the complaint.

Opinion at pp. 2-5 (docket no. 5).

## II. Defendants' motion for summary judgment

### A. Legal Standard

Defendants seek summary judgment on various grounds. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Plaintiff's failure to exhaust his claims

#### 1. Exhaustion requirement

The PLRA, 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

#### 2. MDOC grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a

5

problem with the staff member within two business days of becoming aware of the giveable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. CFM Gilbert and DRF Transfer Coordinator Byrnes

In support of their motion for summary judgment, defendants have presented the affidavit of Richard D. Russell, Manager of the Grievance Section of the MDOC. In his affidavit, Mr. Russell stated that he reviewed the Step III grievance appeals filed by plaintiff at DRF since January 1, 2011. Russell Aff. at ¶ 18 (docket no. 20-2). Plaintiff filed five grievances to Step III, identified as: DRF 11-01-0023-27z (" 23"); DRF 11-01-0096-27z ("96"); DRF 11-01-0095-17b ("95"); DRF 11-01-0094-07a ("94"); and, DRF 11-02-0210-28a ("210"). *Id.* However, none of them named defendants Gilbert or Byrnes. *Id.* Plaintiff has not demonstrated that he named either Gilbert or Byrnes in an exhausted grievance. *See* Response (docket no. 22). While the Step II

appeal of grievance no. 95 referred to "John Does CFA & DRF Transfer Coordinators," this was not in compliance with the requirements of Policy Directive 03.02.130 ¶ R, i.e., that the initial grievance contain the "names of all those involved in the issue grieved." *See Sullivan v. Kasajaru*, 316 Fed. Appx. 469, 470 (6th Cir.2009) (affirming dismissal for lack of exhaustion where prisoner failed to follow requirements of Policy Directive 03.02.130, which explicitly required him to name each person against whom he grieved, citing *Jones* and *Woodford, supra*). Based on this record, plaintiff has failed to properly exhaust a grievance against either of these defendants. *Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Defendants Gilbert and Byrnes' motion for summary judgment should be granted.

### C. Plaintiff's Retaliation claim

To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith*, 250 F. 3d at 1037, *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we

7

are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (internal quotation marks omitted).

Here, plaintiff's claim is based upon an alleged retaliatory transfer from DRF to LCF. A prisoner has no constitutional right to be confined in a particular institution or to enjoy a certain classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983); *Meachum v. Fano*, 427 U.S. 215, 228 (1976) ("[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all"). In light of these two Supreme Court opinions, plaintiff's implied suggestions that well-behaved prisoners should have some enforceable expectation of remaining at a particular prison is not persuasive. Accordingly, "A transfer to the general population of another prison is not considered sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights." *Jewell v. Leroux*, 20 Fed. Appx. 375, 378 (6th Cir. 2001). *See, e.g., Burton v. Houseworth*, No. 90-2096, 1991 WL 105756 at *2 (6th Cir. June 14, 1991) (rejecting a Michigan prisoner's claim for retaliatory transfer because prisoners do not have a constitutional or state-created right to be incarcerated at a particular facility). "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers–El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). *See, generally, Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("the Constitution does not mandate comfortable prisons").

The Sixth Circuit, however, has created a narrow exception to the established general rule that a transfer between prisons cannot form the basis for a First Amendment retaliation claim:

8

> In *Siggers–El*, we carved out an exception for cases in which foreseeable, negative consequences inextricably follow from the transfer—such as the prisoner's loss of his high-paying job and reduced ability to meet with his lawyer. In these exceptional cases, whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact.

*Jones v. Caruso*, 421 Fed.Appx. 550, 553 (6th Cir. 2011) (internal quotation marks, citations and brackets omitted). Thus, to survive summary judgment on a retaliation claim, a prisoner plaintiff needs to make a sufficient showing of the foreseeable, negative consequences that inextricably followed from his transfer. *Id.*, citing *Siggers–El*, 412 F.3d at 701–02. *See also, Hix v. Tennessee Department of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir. 2006) ("the transfer of a prisoner may rise to the level of unconstitutional retaliation where there are foreseeable consequences to the transfer that would inhibit the prisoner's ability to access the courts").

Plaintiff alleged that after the transfer, he met with ARUS Paul at LCF and told Paul that he wanted his living standard re-instated. Specifically, plaintiff wanted a job paying $3.34 a day, a living setting similar to a 2-man cell and proximity to his mother to ease her burden of visiting. Compl. at ¶¶ 42-44. Plaintiff claimed that due to the alleged retaliation and transfer, he suffered damages which included: living in an 8-man cube or 30-man living environment as opposed to a 2-man cell; living arrangements which interfered with his ability to engage in educational studies, sleep and other activities requiring concentration or minimal noise; the possibility that he may "go years" without obtaining a job at LCF that paid $3.34 per day; the loss of wages which hinders his ability to continue his college education, pay an attorney, purchase food and clothing, and call family and friends; and a burden on his mother who must now travel an additional 25 minutes to visit him. *Id.* at ¶¶ 50-56. Consequently, plaintiff is now lacking a purpose in life, is a

9

burden on his family, is financially insolvent, is routinely hungry, and is sleep deprived and/or anxiety ridden. *Id.*

In an affidavit in support of the motion for summary judgment, Warden Lafler pointed out that plaintiff's situation involved nothing more than a routine transfer. Warden Lafler stated that he signed a transfer order and approved of plaintiff's transfer to LCF on January 25, 2011. Lafler Aff. at ¶ 4 (docket no. 20-6). According to Warden Lafler, plaintiff was transferred due to meeting the classification criteria set forth for an alternative placement and to make bed space for incoming transfers from the LCF. *Id.* at ¶ 5. Specifically, LCF needed to move a prisoner to another Level II prison. *Id.* The Warden also stated that "[t]his type of transfer is common as it is often necessary to make prisoner swaps for many reasons such as protection, programming, medical needs, etc." *Id.* In his affidavit in opposition to defendants' motion for summary judgment, plaintiff stated that "[his] transfer and subsequent loss of job wages, change in living setting, increased distance from his mother to visit him, resulting depression, etc., was an adverse hardship that would deter him from pursuing similar complaints." Henley Aff. at ¶ 4 (docket no. 22-5).[1]

Of course, the loss of any job, high-paying or otherwise, is not only foreseeable in <u>any</u> transfer, but is practically a certainty. Jobs are site-specific, and if a prisoner is no longer at the site he cannot do the job. And the loss of any job is obviously a negative consequence, but the court is not aware of any law pertaining to the employment of prisoners in which the Supreme Court has held prisoners shall routinely expect to receive comparable jobs at their new place of employment.

---

[1]Actually, it did not in this case. The month following his transfer, plaintiff sent his list of policy violations to the Director of the MDOC.

Similarly, any transfer that significantly increases the mileage his attorney has to travel to visit him "reduces" the prisoner's ability to meet with his attorney (although the court suspects that most attorney-prisoner client contact is by letter, telephonically or electronically). But, to the court's knowledge, the location of the office, or branch offices, of a prisoner's attorney has never been something officials at the Department of Corrections had to factor into their decision before moving a prisoner to a different prison.

Plaintiff's affidavit did not create a genuine issue of fact that foreseeable, negative consequences inextricably followed from his transfer, such that it prevented him from engaging in protected conduct. *See Jones*, 421 Fed. Appx. at 553; *Siggers-El*, 412 F.3d at 701-02. The gist of plaintiff's affidavit, i.e., that his living condition at LCF did not meet the higher standard of living he enjoyed at DRF, could apply to any prisoner who had settled into a routine at a particular correctional facility. If the court construed this affidavit as sufficient to support a cause of action for retaliatory transfer, then virtually every unwanted prison transfer could be contested on this basis. In short, the *Siggers-El* exception allowing retaliatory transfer actions in exceptional cases would swallow the general rule prohibiting such actions. Accordingly, defendants are entitled to summary judgment with respect to plaintiff's retaliatory transfer claim.

## IV. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 19) be **GRANTED** and that this case be **TERMINATED**.

Dated: March 6, 2013            /s/ Hugh W. Brenneman, Jr.
                                                       HUGH W. BRENNEMAN, JR.
                                                       United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).